### 15367.   BAILEY *v.* GEORGIA RAILROAD.

PER CURIAM.   1. "If the consignee rejects the goods, the carrier's liability as to such ceases, and he becomes liable as warehouseman. As such warehouseman he is chargeable with the duty of notifying the consignor of the consignee's refusal to accept the goods, and with the further duty of holding the same subject to the order of the consignor." *Ala. R. Co.* v. *McKenzie,* 139 *Ga.* 410, 412 (77 S. E. 647, 45 L. R. A. (N. S.) 18); *American Sugar Refining Co.* v. *McGhee,* 96 *Ga.* 27 (1) (21 S. E. 383).

2. But where, under a contract of purchase and sale, goods are shipped in a single lot to the vendee, who accepts them, pays the freight, and actually removes and retains a portion thereof, but afterwards returns to the carrier a part of the goods so removed, and, with himself designated as consignor, returns all the unused portion of the shipment to the vendor, he is liable to the carrier for storage charges which accrued on the goods after their acceptance by him and pending his negotiations with the vendor for their acceptance and return, irrespective of any equities which might exist as between himself and the vendor. The court therefore did not err in directing a verdict against the defendant vendee for the storage charges sued for.

*Judgment affirmed. Jenkins, P. J., and Bell, J., concur. Stephens, J., dissents.*

DECIDED FEBRUARY 28, 1925.

Complaint; from Newton superior court—Judge Hutcheson. December 15, 1923.

*C. C. King,* for plaintiff in error.

*Miles W. Lewis, Reuben M. Tuck,* contra.

STEPHENS, J., dissenting. This is a suit by the Georgia Railroad against W. B. Bailey, to recover the storage charges upon a shipment of a certain lot of flour, shipped by I. Jacobs of Atlanta over the plaintiff's railroad and consigned to the defendant at Covington, Georgia. The depot agent of the plaintiff at Covington testified: that the flour arrived at Covington on June 9; that the freight charges were promptly paid when it arrived but before the defendant had seen the flour; that after the freight charges were paid and the defendant had removed some of the flour, "he came back and said the flour was not what he bought, and that he was not going to take it. I don't remember how many sacks he had got, and he said that he was going to bring that back; his customers had returned it to him; that he had bought one grade of flour and could not use it. I told him then that he had better take it up with the shippers, because the storage would accrue on it if it stayed here over a specified time, which was 48 hours after 7 o'clock the next morning. It stayed there over the 48 hours; it stayed there until June 22; that was eleven days exceeding the 48 hours; it arrived on the 9th, and it stayed two days without storage charges, and the storage started on the 12th. . . He did not tell me to hold it; he did not tell me anything. . . I finally got instructions about shipping it in the 22d day of June. I sent it back to Atlanta; at least my freight clerk sent it to Atlanta, and omitted the storage." The witness further testified: "It was the 9th day of June, whenever that was, it was my recollection, I went to the First National Bank and got the freight before I saw Mr. Bailey at all, but I am not positive about that, because I collected some bills from there, and sometimes he came to the office and paid himself. He gave me orders, such bills as he hadn't paid, when he sent for freight, for me to take them to the First National Bank, and they would pay them, and the bank always paid them. I don't think the flour was brought back the next day or the day after that. I don't recall whether I was there when the flour was brought back or not. I talked with Mr. Bailey about the flour a few days after that; I don't know whether I talked to him in the office or up town; I talked to him about it though. He said the flour was not what he bought and he wasn't going to accept it; he

did not tell me to send it back; he didn't tell me anything about sending it back; he said he was taking it up with the shippers; he told me he was not going to take it, but that's not orders to send it back; said he was going to handle it with him over long-distance phone; told me the flour was not what he bought. . . Mr. Bailey was the one that told me to send it back about 14 days afterwards. . . I don't recall whether he brought any of that [referring to the flour which the defendant had actually taken out] back or not, but I think he did." The defendant testified that the freight was paid before he knew the flour had arrived; that the first he knew about the flour was about six o'clock Saturday night, that customers began to complain about it; that he told the depot agent of the plaintiff that he was not going to take the flour, and that the depot agent told him to take it up with the shipper and see what the shipper would do about it, and that later he told the depot agent to ship the flour back, that the shipper had told him to have it shipped back. It appears, from the evidence of the plaintiff's depot agent, that this shipment was an open shipment. There was introduced in evidence a "memorandum bill of lading dated June 22, 1922, from W. B. Bailey to I. Jacobs, of Atlanta." The consignee stated that he "got a bill of lading." It was not disputed that the storage charges sued for had accrued. The court directed a verdict for the plaintiff, and the defendant moved for a new trial.

Where a shipment of goods is refused by the consignee, the carrier afterwards holds them for the benefit of the consignor. *Alabama Great Southern Railroad* v. *McKenzie,* 139 *Ga.* 410 (77 S. E. 647, 45 L. R. A. (N. S.) 18); *Southern Railway Co.* v. *Born Steel Range Co.,* 126 *Ga.* 527 (55 S. E. 173); *American Sugar Refining Co.* v. *McGhee,* 96 *Ga.* 27 (21 S. E. 383); 10 C. J. 269 et seq. Whatever implied contractual obligation may, under certain circumstances, rest upon the consignee to pay the freight charges upon the property shipped, no such obligation rests upon the consignee where the carrier, at the time of the receipt of the property from the consignor, has notice that the property does not belong to the consignee. 2 Hutchinson on Carriers (3d ed.), § 809. It would seem, therefore, that, where the consignee rejects a shipment and at the same time notifies the carrier that the property does not belong to the consignee, but belongs to the con-

signor, no implied obligation would rest upon the consignee to pay any subsequently accruing warehouse charges upon the goods in the possession of the carrier. A notice to the carrier by the consignee, when rejecting the goods and refusing to accept them, that the goods are refused because they are not in accordance with the consignee's contract with the consignor from whom the consignee purchased the goods is equivalent to a notice to the carrier that the goods do not belong to the consignee. Any reshipment afterwards by the consignee to the consignor is as agent for the consignor, which agency is known to the carrier.

An acceptance of goods from the carrier by the consignee, which the carrier holds without notice as to the title, and which therefore presumably belong to the consignee, would perhaps render the consignee liable upon an implied obligation to pay all charges arising incident to the shipment. While an acceptance, as the basis for such an implied obligation, might arise where the consignee does not actually acquire physical possession of the goods from the carrier, but only agrees to accept them and engages the carrier to hold the goods for the consignee's benefit, there can be no such acceptance where the consignee, after the arrival of the goods at the point of destination and before he has had a reasonable time to remove them from the carrier's possession, refuses to accept them and throws them back upon the carrier with the statement that the goods are defective and are not in accordance with the consignee's contract with the consignor.

The payment by the consignee of the freight charges upon the entire shipment and a receipt by him from the carrier of a part of the goods shipped, and leaving the balance in the possession of the carrier, although the consignee intends subsequently to remove them, does not, when he afterwards refuses to remove the remainder of the goods from the possession of the carrier and authorizes the carrier to return them to the consignor, in my opinion, amount to an acceptance of the entire shipment.

The consignee's act fourteen days afterwards, and after the storage charges had accrued, in telling the depot agent of the carrier to reship the goods to the consignor, amounted to no more than a reaffirmation of the consignee's repudiation of the shipment in the first instance and throwing it back upon the carrier.

34

It certainly is not inconsistent with this former act of the consignee. The carrier at the time had already become under a duty to reship the goods to the consignor if the consignor had so directed. In any event the carrier had become under a duty to hold the goods for the benefit of the consignor and not for the benefit of the consignee. Such a statement by the consignee amounted to no more than the consignee's telling the carrier that which the consignee believed to be the carrier's duty to do under the circumstances. Be that as it may, this statement by the consignee, made about fourteen days after the rejection of the shipment, did not demand the inference that he intended thereby to abandon his rejection of the shipment and to assume jurisdiction over it as owner or as one having a right to control it, or that the agent of the carrier so understood the consignee. Nor does the fact that the consignee accepted from the carrier the bill of lading under which the goods were reshipped to the consignor demand such an inference.

If the consignee, who had accepted and taken part of the goods from the carrier, had, after having refused to accept the remainder of the goods in the carrier's possession, returned to the carrier some of the goods which he had actually taken, the return of such goods was an act perfectly consistent with the consignee's refusal to accept the goods remaining in the carrier's possession. An acceptance by the carrier of the goods so returned (which the carrier was under no duty to accept) amounted to no more than an agreement between the carrier and the consignee to augment the goods rejected, by the addition of those returned, and thereby place the returned goods in the same status with those which had never been delivered, but which had been rejected, and as treating all the goods, including the returned goods, as having been rejected by the consignee.

I am therefore of the opinion that the carrier was not entitled to recover of the consignee the storage charges which accrued after he had refused to accept the goods. The evidence certainly did not as a matter of law establish such a right. I am of the opinion that the verdict for the plaintiff carrier was improperly directed, and I can not therefore concur in the opinion of the majority of the court or in the judgment of affirmance.